**THIRD DIVISION**
**DOYLE, P. J.,**
**REESE and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS
COURT. ALL FILINGS MUST BE SUBMITTED WITHIN
THE TIMES SET BY OUR COURT RULES.*

**March 10, 2022**

# In the Court of Appeals of Georgia

A21A1809. CARLISLE v. BROE.

A21A1814. BROE v. THE CRAFTY YANK, LLC.

DOYLE, Presiding Judge.

These cases trace back to a long-running dispute involving The Crafty Yank, LLC, a company managed by Mark Broe, and John Carlisle (now deceased) regarding a lease and a brew pub business called The Eagle and The Lion.[1] The pub operated on commercial property leased by Home Place Properties, Inc., to The Crafty Yank and Broe. Two lawsuits relevant to these appeals ensued: Home Place Realty sued Broe in February 2013 seeking damages related to alleged breaches of the commercial

---

[1] A suggestion of death in the record indicates that Carlisle died on March 30, 2021. For purposes of this appeal, and absent any relevant distinction between Carlisle and his estate, we refer to Carlisle and his estate interchangeably as "Carlisle."

lease[2] ("Landlord Tenant Lawsuit"), and The Crafty Yank in May 2013 sued Broe for damages allegedly arising from Broe's conduct while running the business ("Fiduciary Duty Lawsuit").

In the Landlord Tenant Lawsuit, Case No. A21A1809, Carlisle, who was also the president of Home Place Realty, appeals from a post-appeal order entering a judgment in his favor but not awarding him damages or a new trial.

In the Fiduciary Duty Lawsuit, Case No. A21A1814, defendant Broe appeals from an order granting summary judgment to plaintiff The Crafty Yank as to Broe's liability for claims of breach of fiduciary duty, breach of contract, and conversion.

For the reasons that follow, we affirm in Case No. A21A1809 and reverse in Case No. A21A1814.

*Case No. A21A1809*

*Procedural Background*. The relevant background was first recounted by this Court in *Carlisle v. Broe (Carlisle I):*[3]

> [The Landlord Tenant Lawsuit] arises out of a dispute over a commercial lease agreement (the "Lease") entered into in September

---

[2] Broe filed related counterclaims against Home Place and added Carlisle as a counterclaim defendant.

[3] 337 Ga. App. 408 (787 SE2d 340) (2016).

2011. Under the Lease, premises located in Griffin, Georgia (the "Premises") were leased to The Crafty Yank, Inc. (the "Tenant") by Carlisle. Broe, The Crafty Yank's CEO, personally guaranteed the Tenant's performance of the Lease. Carlisle claims the Tenant began violating the Lease in numerous ways shortly after the business began operation under the Lease. Carlisle alleges the Tenant violated state and local laws, as well as permitted customers to vandalize the Premises, interfered with other tenants' use and enjoyment of the Premises, and failed to pay for work performed on the Premises that resulted in a lien being filed on the title of the Premises.

On January 5, 2013, Carlisle took possession and control of the Premises and secured all the personal property within. In an e-mail to the Tenant, Carlisle claimed he was seizing the Premises due to Tenant's violations of paragraphs 18 and 19 of the Lease. Carlisle contended that paragraph 27 of the Lease authorized him to reenter and take possession of the Premises, and Paragraph 24 authorized him to secure all personal property on the Premises. He gave the Tenant five days to become compliant with the Lease or the Lease would be terminated. Broe, who acted as the agent for the Tenant, sent Carlisle correspondence on January 10, 2013, through his attorney, indicating the Tenant's desire to terminate the Lease.

On February 8, 2013, Carlisle brought the underlying action against Broe, as guarantor, seeking payment of outstanding rent, late fees, and the cost of repairs to the Premises. Broe filed an answer and counterclaim that included claims for declaratory judgment, wrongful

3

eviction, trespass, conversion, breach of contract, punitive damages, and attorney fees. On September 22, 2014, Broe filed a motion for partial summary judgment on his claims for declaratory judgment, wrongful eviction, trespass, and conversion, arguing that the Lease was invalid and thus the Tenant was not subject to the terms of the Lease. Carlisle filed his own motion for summary judgment on February 13, 2015, contending that Broe's claims for wrongful eviction and trespass should be dismissed as a matter of law.

The trial court entered an order on the cross-claims for summary judgment on July 17, 2015. This order consolidated the trial court's rulings on pending motions in this and several other related cases. With respect to the motions for summary judgment relevant to this case, the trial court denied Carlisle's motion for summary judgment as to Broe's claims for wrongful eviction and trespass . . . and awarded summary judgment to Broe, finding Carlisle liable for wrongful eviction and trespass[;] Broe's conversion claim was withdrawn. [Carlisle's] appeal followed.[4]

On appeal, this Court ruled that there were factual issues regarding the payment of certain late fees and therefore Carlisle's right to reenter the Premises: "Accordingly, the grant of summary judgment in favor of Broe on his claims of wrongful eviction and trespass . . . and the denial of summary judgment as to Carlisle

_____

[4] Id. at 409-410.

on the same is hereby vacated, and the trial court is ordered to make determinations consistent with this opinion."[5]

On remand, a trial ensued, and the jury found in favor of tenant Broe, awarding him $251,681.23 in damages, which included $100,000 in punitive damages and $61,328.73 in attorney fees. Carlisle appealed the denial of his motion for new trial and judgment notwithstanding the verdict ("JNOV"), as recounted in this Court's unpublished opinion in *Carlisle v. Broe*[6] (*Carlisle II*).[7]

> [T]he [trial] evidence shows that Broe and Carlisle entered into a lease in which Broe would rent space for a brew pub in a building Carlisle owned in Griffin, Georgia. Per the terms of the lease, Broe would pay $3,000 per month for a five-year lease. Rent was due on the first of the month, with late fees assessed at $25 per day. . . . [T]he landlord retained the right to terminate the lease for either failure to pay any portion of the rent or for the failure to abide by any of the lease terms, with seven days notice required in either case. Additionally, under [Paragraph] 24 of the lease, "[i]f and whenever the Tenant is in default in payment of any money, whether . . . deemed as rent, or any part of the rent, the Landlord may, without notice or any form of legal process, enter

---

[5] Id. at 413.

[6] Case No. A19A1821 (decided March 11, 2020).

[7] As needed, we have relied on the record in *Carlisle II* (Case No. A19A1821), which remains with this Court at the present time.

5

upon the Premises and seize, remove and sell the Tenant's goods[.]" In conjunction with this provision, [Paragraph] 27 (g) provides: "[i]f the Landlord reenters the Premises or terminates this Lease, then . . . after reentry, the Landlord may terminate the Lease on giving 5 days written notice of termination to the Tenant. Without this notice, reentry of the Premises by the Landlord or its agents will not terminate this Lease."

Broe signed the lease and began renovating the space to install the brewery. He obtained several investors, including Carlisle, and Carlisle solicited additional investors. He also formed a corporation, The Crafty Yank, LLC, as the owner of the pub. Broe was an employee of the pub, with an employment contract that offered him a base pay of $48,000 per year for three years.

The pub opened in March of 2012[,] and almost immediately Carlisle began to complain about the customers and vandalism. Carlisle also started demanding that Broe pay a share of the utilities in the common area, but Broe refused. Carlisle then tried to increase the rent, started blocking access to the hallway bathrooms after hours, and locked the doors that lead from the building into the pub. The pub's business suffered due to Carlisle's actions.

In October, Broe failed to pay the rent by the first of the month. He paid it on October 4th . . . and paid the $75 late fees by a separate check. However, the check bounced before it ultimately cleared on October 12. Broe tendered another $150 check to cover late fees, for a

total of $225 in late fees, leaving a balance due of $50. Broe made the rental payments for the rest of 2012 and for January 2013.

Nevertheless, in early January, Carlisle locked the doors of the pub and notified Broe by letter that he was in breach of the lease and that Carlisle was taking possession of the property. Specifically, Carlisle explained that Broe violated the terms of the lease by failing to exercise control over the pub's customers, which resulted in illegal activity on, and damage to, the property, failing to reimburse Carlisle for repairs to the property, and due to the default in payment of the late fees. Per the terms of [Paragraph] 27 (g), Carlisle took possession of the property and gave Broe five days to remedy the violations.

Carlisle imposed several conditions before he would allow Broe to reopen the pub, including hiring security, changing the pub's hours, and giving Carlisle access to all financial documents. Over the next five days, Broe and Carlisle failed to come to an agreement, and Broe terminated the lease. Broe believed that the real reason Carlisle locked him out of the pub was because he had refused to pay additional rent and Carlisle wanted to take control of the business.

In his own testimony, Carlisle admitted that he took control of the pub to end illegal activities . . . and because it was obvious that the business was failing and that the customers were out of control. Carlisle also testified that he had the right to reenter the property under the lease when Broe failed to pay all the late fees that were due. After Carlisle

sued Broe for breach of contract, Broe counterclaimed for wrongful eviction and trespass.

Following a seven-day trial, the jury found in favor of Broe, and awarded damages in the amount of $90,500; punitive damages of $100,000[;] and attorney fees in the amount of $61,328.73, which was later off-set by $147.50, for a total of $251,681.23 in damages and attorney fees. Carlisle filed motions for JNOV and a new trial, both of which the trial court denied after a hearing. Carlisle now appeals [in *Carlisle II*].[8]

In *Carlisle II*, this Court held:

Carlisle was entitled to JNOV because the evidence showed that Broe breached the lease when he failed to pay the full amount of the late fees, and thus Carlisle was entitled to reenter the property [under the terms of the lease]. . . . [T]here was no conflict in the evidence about the October late payment, and the only conclusion for the jury to reach was that Broe's breach authorized Carlisle to reenter. Carlisle was therefore entitled to JNOV, and the trial court erred in denying the motion.[9]

*Present Appeal.* The above procedural history brings us to the present appeal, which arose from the proceedings after the case was remanded.

---

[8] (Footnotes omitted.) Id.

[9] Id.

Following remand, the trial court entered the following order:

Upon remittitur from the Georgia Court of Appeals in [*Carlisle II*,] this matter [comes] before the [trial court]. . . . [Carlisle] argue[s] that his client was not only entitled to a judgment in Carlisle's favor, but also for an award of damages and attorney fees. [Broe] argue[s] that this Court [does] not have jurisdiction to award damages and attorney fees[,] and if the Georgia Court of Appeals intended such award, that the [appellate] opinion would have included a direction for such award or to submit the issue of damages to a jury. This Court is hesitant to add language or intent to the written opinion of the Georgia Court of Appeals.

Therefore, pursuant to the Court of Appeal's opinion and Remittitur, it is ordered that Carlisle's motion for [JNOV] is hereby Granted and Judgment in favor of Carlisle is hereby entered.

The trial court did not award any damages to Carlisle, and he now appeals, arguing that the court erred after his successful appeal by not awarding him damages (to the extent that they are not in dispute) or holding a trial as to damages on his claims against Broe. We disagree.

Carlisle points to his motion for JNOV and asserts that he is entitled to damages because he sought an order "setting aside the jury's verdict and judgment thereon, grant[ing] judgment to the Defendant or, in the alternative, grant[ing

9

Carlisle] a new trial." But his supplemental motion and brief on this issue, filed after the transcript was prepared, appropriately clarifies the issue:

> During the trial of this case . . . [Carlisle] made Motions for Directed Verdict concerning Plaintiff's claims in reference to the re-entering of the Premises and attorney's fees. The [trial court] denied [Carlisle's] motions[,] . . . and [Carlisle] is now addressing these matters with the [trial court] pursuant to his Motion for [JNOV].

The motion seeks a new trial and "in the alternative to directing a verdict in favor of" Carlisle.

Thus, as explained in Carlisle's briefing in the trial court, the relief he sought (and was entitled to) was a directed verdict in favor of Carlisle *on Broe's "claims in reference to the re-entering of the Premises,"* i.e., the wrongful eviction and trespass that supported the damages award in favor of Broe. On appeal in *Carlisle II*, this Court held that the evidence demanded such a verdict in light of Carlisle's authority to enter the premises after Broe breached the lease by paying only $225 of $275 in late fees he owed. Based on this breach and authority to enter, there was no trespass or wrongful eviction, as the *Carlisle II* opinion concluded: "[T]he only conclusion for the jury to reach was that Broe's breach authorized Carlisle to reenter. Carlisle was therefore entitled to JNOV, and the trial court erred in denying the motion."

10

On remand, the trial court correctly granted Carlisle's motion for JNOV and entered a judgment in his favor. This eliminated the damages and attorney fees awarded to Broe based on his claims, and it was consistent with the motion Carlisle made in the trial court as well as this Court's ruling in favor of Carlisle in *Carlisle II*. Any alternative relief Carlisle sought does not require reversal — as recounted in *Carlisle II*, there was conflicting evidence as to Carlisle's motives and conduct in entering the property.[10] Under these circumstances, we affirm the trial court's post-appeal order entering a judgment in favor of Carlisle on Broe's claims and attorney fee award.

## Case No. A21A1814

This appeal arises from the grant of summary judgment as to Broe's liability in The Crafty Yank's suit against him in the Fiduciary Duty Lawsuit. As noted above,

---

[10] See generally *Estate of Crook v. Foster*, 333 Ga. App. 36, 38 (1) (775 SE2d 286) (2015) ("When considering whether the trial court erred by granting a motion for JNOV, we review and resolve the evidence and any doubts or ambiguities in favor of the verdict; a JNOV is not proper unless there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom demands a certain verdict. Thus, a JNOV may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment. If the evidence is conflicting, or if insufficient evidence exists to make a 'one-way' verdict proper, a JNOV should not be granted.") (punctuation and emphasis omitted), quoting *Plane v. Uniforce MIS Svcs. of Ga.*, 232 Ga. App. 757, 758 (503 SE2d 621) (1998).

11

The Crafty Yank owned and operated a brew pub called The Eagle and The Lion, and Broe was a managing member of The Crafty Yank pursuant to an operating agreement. Broe also worked as an employee, managing the pub pursuant to an employment agreement. When the business relationship soured, The Crafty Yank sued Broe in 2013, asserting claims for breach of fiduciary duty as the initial managing member of The Crafty Yank, conversion, and breach of contract. Broe answered, and eventually The Crafty Yank filed the first of two motions for summary judgment; the trial court denied the first one because the record revealed factual disputes (including an affidavit filed by Broe denying malfeasance).[11] After the 2017

---

[11] In response to The Crafty Yank's original motion for summary judgment, Broe's affidavit averred, in part:

> [T]he business was slow to grow. [The Crafty Yank] did not have enough income to satisfy all of its obligations, and cash did not always arrive as expected. I did my best to manage [The Crafty Yank's] finances by prioritizing payments. I made sure [The Crafty Yank's] employees and its critical suppliers were paid so that Eagle and Lion could continue to operate. I took only a small portion of my salary as general manager.

With respect to an alleged improper alcohol purchase, Broe denied making the purchase, and explained that he sold some already brewed beer to a distributor to raise money to pay the business's tax obligations.

trial in the Landlord Tenant Lawsuit, The Crafty Yank again moved for summary judgment in this case as to Broe's liability based on his testimony at that trial.

The Crafty Yank supported its motion with an affidavit by Carlisle, who averred the following, in relevant part:

> [W]hile managing the day to day operations of [The Crafty Yank] and [The Eagle and the Lion,] . . . Broe blatantly disregarded his obligations pursuant to the Operating Agreement and Employment Agreement, grossly mismanaged the finances of the Company and concealed his actions from the members of the Company, converted property of the Company for his own use and the use of his family, and continued to try to wreck the Company after he was fired pursuant to the Employment Agreement.
>
> . . .
>
> Mark Broe reported different information concerning the sales of the Company to the state than what he reported to the members of the Company. . . .
>
> Mark Broe provided a financial report to the members of the Company that did not mention the Company's checking account while holding internal accounting records indicating that said account had a balance of -$6,236.00. . . .

Mark Broe provided a financial report to the members of the Company on September 24, 2012 that indicated that the Company's net income for the year was -$58,338.82 through August while maintaining internal records that showed the actual net income for the year was -$248,854.73.

. . .

Mark Broe frequently deposited large sums of money from his family that he called "loans" without providing notice or obtaining approval from the other members of the Company . . . .

Mark Broe illegally bought liquor and beer from a retailer for the Company to [resell] at the Business in November and December 2012.

Months after being removed[,] . . . Mark Broe obtained beer that was owned by the Company and sold the beer to a distributor for $2,038.35. Instead of returning the funds to the Company, Mr. Broe fraudulently and without the consent of the Company, created a fake bank account in the name of the Company to deposit the check written to the Company and then withdrew the cash from the account for his own use.

Mark Broe continues to hold the financial records of the Company in his possession on the computer in his bedroom and [has] refused to provide the records to the Company.

14

The affidavit averred that these facts were undisputed, relying on citations to Broe's earlier testimony in the Landlord Tenant Lawsuit.

Broe responded by opposing the motion and filing an affidavit of his attorney authenticating transcript excerpts that more fully related the context for Broe's trial testimony.

Following a hearing, the trial court entered an order relying on the affidavits and Broe's trial testimony from the Landlord Tenant Lawsuit to grant summary judgment to The Crafty Yank as to Broe's liability for breach of fiduciary duties, breach of contract, and conversion. The trial court's order stated that the dispositive facts were not in dispute, and it listed its findings of fact as to Broe's conduct that supported The Crafty Yank's claims.

Broe now appeals, contending that the trial court erred by granting summary judgment as to his liability to The Crafty Yank's claims because the record contains genuine issues of material fact that should not have been summarily resolved against him by the trial court. We agree.

As a threshold matter, we note the familiar summary judgment standard: "To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed

facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law."[12] If "the party moving for summary judgment is the plaintiff, he must make a prima facie showing that no material issues of fact exist and that he is entitled to judgment as a matter of law before the burden shifts to the defendant to establish a possible defense."[13] Finally,

> [t]rial court rulings on summary judgment enjoy no presumption of correctness on appeal, and an appellate court must satisfy itself de novo that the requirements of OCGA § 9-11-56 (c) have been met. In making that determination, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant."[14]

Here, the trial court noted a series of factual findings it held were undisputed, based on Broe's trial testimony in the Landlord Tenant Lawsuit. For example, the order states, in relevant part:

---

[12] (Citations omitted.) *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

[13] *Tselios v. Sarsour*, 341 Ga. App. 471, 473 (800 SE2d 636) (2017).

[14] (Citations and punctuation omitted.) *Nash v. Reed*, 349 Ga. App. 381, 381-382 (825 SE2d 853) (2019).

16

The trial court finds that Broe maintained separate internal records that were different from those records shared with members of the Company. . .

The Court finds that [Broe] provided financial reports to the Company members on September 24, 2012 that indicated that the Company's net income for the year was negative (-) $58,338.82 through August while maintaining internal records that showed the net income of the Company was negative (-) $238,854.73. [Broe] concealed internal financial reports from members that indicated losses of approximately $80,000 between March and July of 2012. [Broe] used . . . company funds to pay Tom Broe's residential cable bill for April 2012 and did not disclose the fact on financial reports to the members. . . . The Court finds that [Broe] failed to account for a wire transfer to an undisclosed [recipient] in the amount of $5,500. The Court finds that [Broe] disbursed company funds to family members without the requisite approval . . . and failed to properly report the disbursements to all members of the Company. . . .

The Court finds that [Broe] obtained loans for the Company without seeking the requisite approval of the members. . . .

[Broe] sold alcohol that was purchased at a retail store and resold on the premises in a manner inconsistent with Georgia law in violation of the Operating Agreement.

17

[Broe] inhibited [The Crafty Yank's] access to funds in the credit card system following the landlord's lawful re-entry of the premises. . . .

[After his termination, Broe improperly] obtained a check to [The Crafty Yank] . . . and has not accounted for the funds whereabouts.

[Broe] did not return company property and . . . continues to hold financial records, QuickBooks programs and property owned by [The Crafty Yank] and refuses to turn said records over to [The Crafty Yank].

Based on these findings, the trial court concluded that there is no dispute that Broe breached his fiduciary duty to The Crafty Yank and that he "acted intentionally, in bad faith, without deliberation, and with at least gross negligence." Likewise, with respect to breach of contract, the trial court ruled that there was no dispute that Broe "disregarded the contractual obligations he owed" under the Operating and Employment Agreements because Broe "offered no compelling testimony to refute the statements" he made at trial.

The trial court's findings of undisputed fact are based on the Carlisle affidavit that in turn refers to excerpts of Broe's trial testimony during cross-examination. But as pointed out by Broe, these excerpts, when read in the fullness of their context and

in the light most favorable to Broe, are not conclusive as to his liability. For example, with respect to creating separate financial records for the business and the members, Broe testified on cross-examination that a certain alternative spreadsheet was inaccurate, stating, "I've already testified under oath that this is incorrect. . . . [L]et me explain. . . . I did not make them, and whoever made them made them wrongly." He also disputed making another disputed financial record of a similar kind. With respect to the September 24, 2012 disclosure to the company members with an alleged discrepancy in income, Broe explained the discrepancy by pointing out that the accounting period included a portion of time when the pub was not operating: "[T]hat's why there's a big negative there." He had provided the financial report to the members for the purpose of calling a meeting "to review the financials and assess where we stand and discuss the future." If believed, this testimony would support an inference that Broe was not intentionally trying to mislead the members.

Broe's testimony further included context about alleged concealment of financial reports that, when read in full, show that certain discrepancies about loss statements were "mistaken." But the cross-examination does not reveal more about Broe's motive or the impact of the alleged mistake. Further, Broe explained that a certain alleged withdrawal of $26,340 in August 2012 was money that might have

been used to repay a loan made by his mother to the business, but it was so long ago he could not recall where the money went. This testimony supports an inference that Broe *could* have withdrawn the money improperly, but it alone is not conclusive as to Broe's misuse of the money, and when viewed in the light most favorable to Broe, it supports an inference that the withdrawal paid a company expense, even if it was unorthodox. Broe likewise disputed using company funds for personal expenses, including for Tom Broe's cable bill, he disputed locking The Crafty Yank out of the company's credit card system, and he disputed any impropriety in a wire transfer questioned by The Crafty Yank's counsel.

In sum, as fully outlined in Broe's appellate brief, the record relied upon by The Crafty Yank and the trial court contains factual disputes with respect to Broe's conduct and motives that preclude summary judgment at this time as to The Crafty Yank's claims. To demonstrate a breach of fiduciary duty, The Crafty Yank must show, in part, that Broe failed to act "in a manner he . . . believe[d] in good faith to be in the best interests of [The Crafty Yank] and with the care an ordinary prudent

person in a like position would exercise under similar circumstances."[15] Also, as a general rule, Georgia law

> generally precludes claims against officers and directors for their business decisions that sound in ordinary negligence, except to the extent that those decisions are shown to have been made without deliberation, without the requisite diligence to ascertain and assess the facts and circumstances upon which the decisions are based, or in bad faith.[16]

Therefore, the merits of The Crafty Yank's claims turn on Broe's level of deliberation, diligence, and bad faith. The record may raise questions about Broe's conduct, but it does not fully dispose of the triable issues as to Broe's conduct, including his deliberation, diligence, and bad faith. As asserted by Broe, the business did not perform as expected, and his job was made difficult by the lack of expected income. According to Broe, he made choices about which vendors to pay, and at least in part, his correspondence with the members suggests some attempt to disclose the financial difficulty and discuss next steps.

---

[15] OCGA § 14-11-305 (1) (outlining the duties of a manager of a limited liability company).

[16] *FDIC v. Loudermilk*, 295 Ga. 579, 585 (1) (761 SE2d 332) (2014).

In a similar way, Broe's testimony is also not conclusive as to what conduct amounted to a breach of his employment contract[17] and his alleged conversion.[18] The record contains some evidence that implicates Broe, but it also contains equivocation, explanation, and denial under oath by Broe. "At bottom, the 'cardinal rule' on summary judgment is that 'the court can neither resolve the facts nor reconcile the issues, but only look to ascertain if there is an issue.'"[19]

Even if some aspects of Broe's conduct appear inexplicable or undisputed, there are other aspects that are materially disputed. Such a record cannot support summary judgment even as to liability because any subsequent resolution of damages

---

[17] See generally *Global Payments Direct v. Frontline Processing Corp.*, 360 Ga. App. 753, 757-758 (1) (859 SE2d 909) (2021) ("The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken.").

[18] See generally *Gryder v. Conley*, 352 Ga. App. 891, 894-895 (1) (836 SE2d 120) (2019) ("Under Georgia law, conversion consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation. If the defendant came into possession of the property lawfully, the plaintiff must show that the defendant unlawfully refused to return the plaintiff's property after the plaintiff demanded its return.") (citation and punctuation omitted).

[19] *Nash*, 349 Ga. App. at 386 (3).

would depend in part on causation that could not be parsed out from the disputes in the record.[20]

> [I]t is precisely because there are bits of evidence in the record which create genuine issues of material fact that summary judgment is not appropriate in this case. It is not the role of this Court, but is the role of a jury to sort through the evidence, resolve conflicts, and make findings of fact based on the evidence it finds credible. A jury in arriving at a conclusion upon disputed issues of fact may believe a part of the testimony of a witness or witnesses, and reject another part thereof, it being their duty to ascertain the truth of the case from the opinion they entertain of all the evidence submitted for their consideration. Indeed, because it is a jury's prerogative to accept or reject, in whole or in part, the evidence submitted, generally the question of [intent and good faith] is a question for the jury.[21]

Accordingly, based on the record before us, the trial court erred by granting partial summary judgment to The Crafty Yank on its breach of fiduciary duty, breach of contract, and conversion claims.

---

[20] For example, the Crafty Yank's conversion claim is predicated in part on a computer that remained in Broe's possession, but it is also based on "failing to account for tens of thousands of dollars of the Company's funds that were earned under his exclusive management. . . ." The record is mixed as to those circumstances and therefore the issues of liability and causation.

[21] (Citations and punctuation omitted.) *Montgomery v. Barrow*, 286 Ga. 896, 898-899 (1) (692 SE2d 351) (2010).

*Judgment affirmed in Case No. A21A1809 and judgment reversed in Case No. A21A1814. Reese and Brown, JJ., concur.*